1:21-cv-00490

# *EXHIBIT 1*

TRAVISCOUNTYTX ★ GOV (https://www.traviscountytx.gov)

**District Clerk - AARO - Attorney Access to Records Online**

# Details

Updated : Friday, May 14, 2021 4:36:59 AM

| | |
|---|---|
| Cause Number | D-1-GN-21-001985 |
| Style | VILLARREAL V SCHWAB AND CO INC |
| Filed Date | 4/29/2021 |
| Court | 419 |
| Type | EMPLOYMENT (GEN LIT ) |
| Case Status | PENDING |
| Action/Offense | |
| Hearing Date | |

Request Documents (https://www.traviscountytx.gov/distr

New Search (/aaro/)

| Attorney | Type | Party - Full/Business | Party - Person |
|---|---|---|---|
| CALLAHAN CHARLES ASHLEY | PLAINTIFF | | VILLARREAL , RENE |
| | DEFENDANT | CHARLES SCHWAB AND CO INC | |

| Date | Court | Party | Description | Category | Pages | |
|---|---|---|---|---|---|---|
| 5/6/2021 | 419 | DF | EXECUTED SERVICE | SRVPROCESS | 2 | Download (/aaro/Default/GetPdf?barCodeId=7588569) |
| 5/3/2021 | 419 | DF | ISS:CITATION | ISSUANCE | 1 | Download (/aaro/Default/GetPdf?barCodeId=7582269) |
| 4/29/2021 | 419 | PL | ORIGINAL PETITION/APPLICATION | PET-PL | 18 | Download (/aaro/Default/GetPdf?barCodeId=7582263) |

Request Documents (https://www.traviscountytx.gov/district-clerk/records-request)

New Search (/aaro/)

© 2021 Travis County, Texas - All rights reserved.

4/29/2021 1:45 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-21-001985**
**Alexus Rodriguez**

CAUSE NO. D-1-GN-21-001985

| | | |
|---|---|---|
| RENE VILLARREAL | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | 419TH _____ JUDICIAL DISTRICT |
| | § | |
| | § | |
| CHARLES SCHWAB & CO., INC | § | |
| *Defendant.* | § | TRAVIS COUNTY, TEXAS |
| | § | |

## **PLAINTIFF'S ORIGINAL PETITION**

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Rene Villarreal, Plaintiff, and files this her Original Petition against Charles Schwab & Co., Inc. (hereinafter referred to as "Defendant" or "Schwab"), its affiliates, subsidiaries and other related entities, under any name by which they are known, and for her causes of action would show the Court as follows:

### **Discovery Control Plan**

1. Plaintiff is seeking to recover more than $200,000 but less than $1,000,000.Discovery in this case is intended to be conducted under Level 3 of Rule 190 of the Texas Rules of Civil Procedure.

### **Parties**

2. Plaintiff Rene Villarreal ("Plaintiff" or "Mr. Villarreal") is a Texas citizen and resident who is a former employee of the Defendant.

3. Defendant Charles Schwab & Co., Inc. is a California corporation whose principal

place of business, corporate headquarters, and nerve center are in Texas. Without limitation, the center of corporate direction, control, and coordination for Defendant are all in Texas. Defendant may be served with citation through its registered agent, CT Corporation System, at 1999 Bryan St. STE. 900, Dallas, TX 75201.

### Jurisdiction and Venue

4.  This Court has jurisdiction over the subject matter and the parties to this case and all conditions precedent to the filing of this suit have been met or waived and venue properly lies in Travis County, Texas. The Court's jurisdiction over this suit is proper pursuant to the Texas Commission on Human Rights Act, Tex. Lab. Code Ann. § 21.001 *et. seq.* The amount in controversy in this dispute is within the jurisdictional limits of this Court. All or a substantial part of the events giving rise to Plaintiff's claim occurred in Travis County, Texas.

5.  All conditions precedent and administrative remedies necessary for the filing of this case have been satisfied by Plaintiff.

### Factual Background

6.  Defendant hired Mr. Villarreal full-time on or about August 16, 1999 as a Trader in Austin, Texas. Soon, Mr. Villarreal became a Team Lead. Following an acquisition in 2007, Mr. Villarreal was given the title of manager but did not have any direct reports, yet he still oversaw daily trading operations. Defendant appointed Dan Cliffel as Mr. Villarreal's Director, with Drew Hancock just above Mr. Cliffel as another Director, both in the Austin location. Catherine Gallowday, Senior Vice President, was above all of these individuals.

7.  In 2009, Defendant moved its local office to Cedar Park, Texas. Mr. Villarreal took on a spectrum of progressively and increasingly challenging roles and duties for the company. Mr. Villarreal was (and still is) well respected in the industry. In two decades at the company, Mr. Villarreal never had any write-ups, Performance Improvement Plans, or any other disciplinary history. Mr. Villarreal served and executed his roles with Defendant exceptionally, and never imagined his 20+ years of service would be cut short through being terminated on illegal grounds.

8.  Mr. Villarreal was given six direct reports in 2010, three of whom were in Austin and the other three were in Richfield, Ohio. Mr. Villarreal's team began to develop process improvements and automation to increase efficiency and reduce risks.

9.  In August 2013, Mr. Villarreal's wife, Emily Villarreal, was diagnosed with a brain condition. After several unsuccessful surgeries, Mrs. Villarreal passed away on November 22, 2016 .

10. In June 2017, Mr. Villarreal saw an opening for a new manager position in the Defined Benefits ("DB") department that was available in Austin. Mr. Villarreal interviewed and got the position.  He was eager to help improve this department's operations.  Mr. Villarreal began reporting directly to Mr. Hancock. Mr. Villarreal's counterpart, Helen David, worked in Richfield as a Senior Manager.  From the start, Mr. Hancock wanted Mr. Villarreal to find efficiencies in this department and work with Ms. Davis on implementing them. Mr. Villarreal and Ms. Davis worked great together, despite the task itself being difficult since this department had high workloads and an array of manual and client-specific processes.

11. In about March 2018, Val Jesionek joined the team in Richfield. She was the sister of Dave Jesionek, who was already on the team. Schwab's policy states that siblings may not report to the same manager. Therefore, Mr. Villarreal was asked to begin managing Mr. Jesionek along with two other employees who worked exclusively on disbursement payments and special projects. Mr. Villarreal was told at this time by Ms. Davis and Mr. Hancock that Mr. Jesionek was a senior member of the team and would not require much supervision. Mr. Jesionek also had the most DB knowledge and experience on the team.

12. Mr. Jesionek was assigned some of the more demanding clients, and he worked on calculating benefits and plan data updates along with special client requests. Other than Mr. Jesionek, Mr. Villarreal had two employees in Austin who did this type of work but were still relatively new to the process. The others who reported to Mr. Villarreal handled the document mailing, distribution payment set up, and queue work to keep the jobs moving. Once Mr. Jesionek began reporting to Mr. Villarreal, he heard from Ms. Davis that Mr. Jesionek had a known issue with staying at his desk during work hours, and could often be found in the second-floor lobby talking on his cell phone. Mr. Villarreal discussed this with Mr. Jesionek during their weekly one-on-one video conference. Instead of fixing the issue, Mr. Jesionek started this same practice in the lunchroom.

13. In June 2018, Mr. Villarreal recruited and hired Teresa Hotard in Austin who had previous DB experience with Willis Towers Watson. Mr. Villarreal's plan was to have her become a Team Lead in Austin, which a position he did not have at the

time. There were two Team Leads in Richfield. Ms. Hotard did an excellent job from the start and began gaining respect from others in the Actuary and Client Service Teams, as well as overseeing the queue work for Mr. Villarreal's team in a manner that resulted in it proceeding more smoothly.

14. In Mid-July 2018, one of Mr. Villarreal's team members went on medical leave. He already began to address certain performance and conduct issues with this employee prior to going on leave. Mr. Villarreal then worked with Amanda Morales in Employee Relations and Mr. Hancock to ensure the proper steps were taken around her leave, and in any potential disciplinary action that may soon follow. She ended up coming back for about two weeks in October 2018, but then needed additional surgery.

15. In or around late June 2018, Mr. Villarreal's team moved to the new campus near The Domain in North Austin.

16. In September 2018, one of the employees on Mr. Villarreal's team discovered that a MVA Plan Participant was receiving an additional benefit amount in error. MVA was Mr. Jesionek's responsibility to oversee, so Mr. Villarreal began asking him to look into the error. Mr. Villarreal told and reminded Mr. Jesionek of this fact in every one-on-one meeting, but he was always "too busy" to get it corrected. Mr. Jesionek offered excuse after excuse as the reasons why other work took priority over making this correction. For one year following, this remained an outstanding correction item.

17. In October 2018, the team member who was out on leave in Mid-July 2018, came back after her surgery. She then went back on leave, and Schwab allowed her to work from home as part of her reasonable accommodations. In fact, other employees at Defendant were also given accommodations in the workplace. This procedure simply included turning in a doctor's note or accommodations to management. The employee's manager approves the accommodation request once it is determined that implementation is feasible, and the manager has sole discretion to approve or deny the request.

18. In November 2018, one team lead in Richfield, Tim Karns, left Defendant. This added more work to the team. It also opened the door for Mr. Villarreal to promote Ms. Hotard to Team Lead and assign her to oversee the operations in Austin, which she was already doing without the official title and authority. Mr. Villarreal met with Mike Culp, who would be moving over to his department as Vice President, about the open position. Mr. Culp told Mr. Villarreal if he felt there was someone ready for the position, then to simplify the process Mr. Villarreal should move that person into the position and backfill the empty position. As directed, Mr. Villarreal did just that. Mr. Villarreal envisioned Ms. Hotard becoming a Senior Specialist in Austin at a future date.

19. In early January 2019, the same employee who had obtained leave multiple times and was working from home was due back into the office after being released by her doctor. She was reluctant to accept Mr. Villarreal's approval to return to the office. As Mr. Villarreal was waiting for her return, he received a call from Ashley

Hixson in Employee Relations asking Mr. Villarreal what was going on. Ms. Hixson further questioned if Mr. Villarreal was making her break policy by having her come into the office. Mr. Villarreal explained she had been released, and according to policy, Mr. Villarreal as her manager could make the decision to have her work in the office instead of working from home. Ms. Hixson agreed, and the employee came into the office that day.

20. Mr. Hancock accepted a new role in January 2019 with Defendant's RPS department as it was reorganized by Defendant. Ms. Gallowday was promoted to Executive Vice President. Mr. Culp became Vice President over Mr. Villarreal's department, and reported to Ms. Gallowday. Also, Dave Clarke took over Mr. Hancock's role as a Senior Manager, instead of a Director position, and reported to Mr. Culp. As a result, Mr. Villarreal, Ms. Davis, and Ryan Graham then began reporting to Mr. Clarke. Since reviews were already in process, Mr. Hancock gave Mr. Villarreal his review in 2019, which was "met expectations." If there were not as many client issues, high work volume, audits, other projects, and Mr. Villarreal had the ability to implement more enhancements, he could have reached "exceeded expectation." Also, in January, Mr. Villarreal followed up with Mr. Clarke on the open position from Mr. Karn's departure. Mr. Clarke said they should have Ms. Hotard apply for it. After Mr. Villarreal decided Ms. Hotard was the top candidate, with Ms. Davis' backing, Mr. Clarke stated that she was not ready, and instead they should promote someone in Richfield. In Mr. Villarreal's nearly ten-year career as manager at the time, this was the first experience when he was told he could not

promote a deserving employee when the opportunity and availability were both present.

21. In February 2019, Mr. Villarreal gave Ms. Hotard an "exceeded expectations" rating but could not promote her. Mr. Villarreal gave Mr. Jesionek a "met expectations," but could not give him much of a salary increase since he was near the top of his grade. Mr. Villarreal also told Mr. Jesionek that Mr. Clarke noticed him on frequent breaks as well. Mr. Jesionek was unhappy with his review. Mr. Villarreal gave the employee who was out on leave and recently back in the office, a rating of "inconsistently met expectations," which she refused to accept. Mr. Villarreal spoke with her for over two hours. During his meeting with Amanda Morales, she stated if the employee did not accept the issuance of a review to stop it, reschedule, and have Mr. Clarke sit in. As such, Mr. Villarreal did just that.

22. In March 2019, Mr. Clarke went to Austin for a visit. They completed the employee's review who would not accept the terms. This was the first time those two met. Mr. Villarreal also told Mr. Clarke he needed to meet with Ms. Hotard to give her reassurance of her value to the department and firm. Mr. Clarke eventually did meet with Ms. Hotard, but based on her account of the meeting given to Mr. Villarreal, it was awful. Ms. Hotard stated that she did not feel supported as an employee or future leader on the team. Accordingly, Ms. Hotard turned in her resignation shortly after this meeting. Again, the team had to take on additional work from Ms. Hotard's departure, and negative morale continued to increase.

23. In about March 2019, Mr. Villarreal was contacted by Employee Relations that the employee who had just been given the review from Mr. Villarreal and Mr. Clarke filed a discrimination complaint against Mr. Villarreal. Employee Relations interviewed Mr. Villarreal. Then, Mr. Culp collected all the statements and made a final ruling. He ruled that Mr. Villarreal did not in any way violate policy or the law with his handling of the employee during her medical leave or with her review. The ruling was based in part on the fact that Mr. Villarreal had already begun addressing disciplinary and performance issues with the employee prior to her medical leave.

24. In May 2019, after reviewing a few candidates for Ms. Hotard's replacement, both Ms. Davis and Mr. Villarreal decided to offer the position to Elaine Botello. She would be able to help with the distribution tasks in the department. As background, Mr. Villarreal knew Ms. Botello as a professional colleague from working together at K Co. On occasion, they would have lunch together. Once Mr. Clarke learned they were colleagues, he directed Mr. Villarreal to hold off on the offer until he took it to Employee Relations. Within almost no time, Employee Relations said this was a non-issue so long as Mr. Villarreal did not show favoritism. Again, this was a direct push at Mr. Villarreal by Mr. Clarke in allowing Mr. Villarreal to manage.

25. In July 2019, the other team lead in Richfield, Mike Prendergast, resigned. He received a better position with another firm. Mr. Clarke and Mr. Culp met with Mr. Prendergast a few times trying to get him to change his mind, but he left. Again, this created more work for the rest of the team. There were some additions to the team

but only employees new to DB. There were no longer any Team Leads on the DB

team, and it remains so to this day to the best of Mr. Villarreal's knowledge.

26. In early August 2019, during a mid-year review, Mr. Clarke stated he wanted Mr.

Villarreal to improve two employees' performance, one of which being the person

who had complained to Employee Relations. Mr. Clarke told Mr. Villarreal during

this exchange that he had a "lack of urgency." Part of Mr. Villarreal's end of year

review would be determined by how he improved employee performance. He was

able to improve one but not both, and focused on helping the employees focus on

their strengths. This evidenced Mr. Villarreal's more hands-on approach to

management and a different style than Mr. Clarke's, but by no means amounted to

a "lack of urgency."

27. In August 2019, Mr. Jesionek finally made the correction for the MVA Participant

that was being overpaid. The loss to the firm was $100,000.00. Before any official

communication went to this Participant, the MVA plan made the decision to buy

back some of its outstanding annuities. A full audit of the benefit payments was

required. An employee in Mr. Villarreal's department began the audit and

discovered eleven Participants were being overpaid. The loss to the firm for this

error was over $1 Million. The error occurred when the plan was initially set up in

2012, before Mr. Villarreal was on the team. Mr. Jesionek was directly involved and

responsible, and there were at least two other occasions when Mr. Jesionek could

have discovered this error but never followed through. There was also an employee

in Conversions that was directly intertwined. To Mr. Villarreal's knowledge, she is still employed by Defendant.

28. In September 2019, Schwab laid off 600 employees firm wide. Ms. Davis was one of them. She had been part of the DB team for a couple years longer than Mr. Villarreal. As such, she was more knowledgeable than Mr. Villarreal. Upon Ms. Davis' departure, Mr. Villarreal was assigned the projects she had been working on. Manny Jimenez was moved over to replace Ms. Davis. He was a newer manager with no DB experience, and he wanted to change the process. Mr. Jimenez began mandating changes without fully vetting with the team and internal partners. Mr. Villarreal mentioned his concerns with Mr. Clarke in a one-on-one. It was the only bit of support and advice he had ever given Mr. Villarreal, and he said Mr. Villarreal was playing the victim. Mr. Clarke also told Mr. Villarreal he was not going to hold his hand.

29. In October 2019, a retro-review of the "million dollar error" began. Mr. Villarreal was interviewed by auditors, and then on a call with Mr. Clarke and Mr. Culp. The questions Mr. Culp had were mainly about Mr. Villarreal's performance and of managing Mr. Jesionek. In this, Mr. Villarreal discussed in detail the challenges the department had faced. Mr. Villarreal was emailed a summary of this meeting.

30. In December 2019, Mr. Villarreal's job continued to become more stressful. There were at least two internal audits occurring, one of which was an audit of all converted plans that was started by an employee who retired but was asked to come back and perform the audit. There were management action plans to address

performance gaps, legal issues from document revisions, day-to-day activities, new plans that were being converted, plan events, performance issues, process enhancements, and reporting and notices that were becoming due. In fact, Mr. Villarreal also had all this going on during the last few months of the year prior as well. People at work started asking Mr. Villarreal what was wrong with him because his anxiety was physically visible. They also commented that Mr. Villarreal "looked really stressed."

31. On December 16, 2019, on the way to work after visiting his family in Houston over the weekend, Mr. Villarreal felt like he was going to die. Based on what remains from his memory, Mr. Villarreal believes he had a full panic attack. He went to the bathroom once he got to work. Next, Mr. Villarreal went into an empty conference room and called his doctor. He made an appointment for the next day. Mr. Villarreal wanted to go that same day, but he had to attend a rescheduled meeting during that same time from being out the prior Friday visiting his family.

32. On December 17, 2019, Mr. Villarreal was treated by his Primary Care Physician, who directed Mr. Villarreal to take time off and get some help. It took the doctor some time to complete the entirety of the Family and Medical Leave Act ("FMLA") documentation, since he would be out of the office for the holidays. Nevertheless, this task was completed and sent into Schwab. The physician did not diagnose Mr. Villarreal, but instead suggested he see a psychiatrist.

33. On February 17, 2020, Dr. Israel Calzada at Round Rock Psychiatry met with Mr. Villarreal, approved the FMLA, and prescribed Mr. Villarreal medication to cope

with his now diagnosed Anxiety, Depression, and Stress. Mr. Villarreal was also instructed to meet with a therapist to help, so that he would not need to remain on medications. The medications were difficult to get used to and still cause Mr. Villarreal to have sleeping issues.

34. On March 16, 2020, Mr. Villarreal received his release to return to work from Dr. Calzada. First, Mr. Villarreal forwarded this document to Mr. Clarke so he could return to work. The release letter also included two accommodations requests of working no more than forty hours per week, as well as allowing half of Mr. Villarreal's work to be done remotely from home. Mr. Clarke told Mr. Villarreal that he would forward the requested accommodations to the Employee Relations department and would work with them, which is not typical. Rather, submission to Mr. Clarke was the preferred and typical protocol for employees turning in doctor notes and requests for accommodations to management at Defendant.

35. On March 17, 2020, Mr. Villarreal met with Mr. Clarke in a one-on-one. He welcomed Mr. Villarreal back from being out for twelve weeks on FMLA but did not ask how he was doing. He told Mr. Villarreal to get caught up on emails, and that Defendant terminated Mr. Jesionek for his direct involvement on the "million dollar error." Mr. Villarreal told Mr. Clarke that someone needed to reinstate much of his computer access, and that he was also having issues with his laptop. Furthermore, Mr. Villarreal asked Mr. Clarke about the accommodations request. Mr. Clarke said he was working with someone on it. Mr. Villarreal asked if it was "Sue" in Accommodations. Mr. Clarke said it was not Sue. Mr. Clarke instead said

he was working with Ms. Hixson. Immediately, Mr. Villarreal thought it was odd he was working with Employee Relations. Mr. Villarreal followed up and specifically asked Mr. Clarke at least two more times about the status of his accommodations request. Mr. Clarke said he was still working on it. Mr. Villarreal never received any information regarding the accommodations, despite the fact that it is solely up to the manager to approve accommodations.

36. In March 2020, the medications had helped Mr. Villarreal some, but the job was still the same. Mr. Villarreal also did not see things improving anytime soon. He also learned that the weekly meeting that he led with the Directors of the Actuary and Client Service teams did not occur while he was out on FMLA, and that many other tasks were left untouched. Then the department started getting set up to work from home due to the COVID-19 virus outbreak. There was one task that included printing documents that required Mr. Villarreal to go into the office to complete until he could create a workaround. Otherwise, nearly everyone was working remotely in the Austin and Richfield offices.

37. On April 3, 2020, shockingly less than two weeks after Mr. Villarreal returned from FMLA and turning in Dr. Calzada's accommodations request to his manager, Defendant terminated Mr. Villarreal. When Mr. Villarreal called in for the weekly one-on-one, Mr. Clarke told Mr. Villarreal that he was going to be direct, with Manny Jimenez on the line as well. Mr. Clarke said Mr. Villarreal was being terminated due to his inability to manage his team and Mr. Clarke's notation of his "lack of urgency." Mr. Villarreal ultimately learned that Defendant replaced him

with Hoanmy "Dinh" Ngyuen, an employee who, based on information and belief, is under forty years old.

38. Mr. Villarreal's termination itself under such circumstances is evidence of Defendant's discriminatory and retaliatory intent. Defendant could have presented Mr. Villarreal with options other than his termination, and Defendant certainly should have granted his accommodation request (as Defendant did for others to work remotely both before and during the COVID-19 virus pandemic). Mr. Villarreal's termination, his return from FMLA leave, and accommodation request are all close in "short temporal proximity" to the illegal acts that form the basis for this lawsuit.

### Statement of Claims

Texas Commission on Human Rights Act

39. In this petition, Plaintiff is not seeking any remedy under any federal statute.

40. Through the actions summarized above as well as other actions that are not detailed in this pleading, Defendant has engaged in unlawful employment practices in violation of the Texas Commission on Human Rights Act, Tex. Lab. Code Ann. § 21.001 *et. seq.*

41. Defendant's discriminatory treatment and the termination of Plaintiff's employment was motivated by and due to his age.

42. Defendant's discriminatory treatment and the termination of Plaintiff's employment was motivated by and due to his disability, namely Anxiety, Depression, and Stress, all of which were medically documented and submitted as grounds for reasonable

accommodations that Defendant never provided or seriously considered.

43. Defendant also violated Plaintiff's rights under the FMLA which can be enforced in Texas state court.

44. The effect of Defendant's wrongful conduct has been to deprive Mr. Villarreal of equal employment opportunities and to otherwise affect his status as an employee based on disability, age, and the FMLA in violation of the TCHRA.

45. The unlawful practices complained of above were intentional.

46. The unlawful employment practices complained of above were done with willfulness, malice, and/or reckless indifference to the statutorily protected rights of Plaintiff and thus punitive damages are appropriate in this case.

## Damages

47.  As a consequence of the foregoing facts and the willful and malicious nature of the wrongs committed against the Plaintiff, Plaintiff has suffered and will suffer past, present, and future economic loss, for which Plaintiff pleads to recover at trial.  The backpay and reinstatement/front pay damages sought are within the jurisdictional limits of this court.

48. As a consequence of the foregoing facts and the willful and malicious nature of the wrongs committed against the Plaintiff, Plaintiff has suffered and will suffer past, present, and future mental anguish, for which Plaintiff pleads to recover at trial.  The damages for said mental anguish and other compensatory damages sought are within the jurisdictional limits of this court.

49. As a consequence of the foregoing clear and convincing facts and the willful and

malicious nature of the wrongs committed against the Plaintiff, Plaintiff is entitled to punitive damages.

50. As a consequence of the wrongful conduct of the Defendant as described above, Plaintiff has been required to retain legal counsel to prosecute this case. Plaintiff is entitled to reasonable attorneys' fees, expert fees, other litigation expenses, and court costs.

## Jury Demand

51. Plaintiff respectfully demands that this Court impanel a lawful jury to hear this case, and has paid the applicable fee.

## Prayer

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear to answer herein and that upon final hearing, the Court enter judgment in favor of Plaintiff against Defendant in an amount in excess of the minimum jurisdictional limits of this Court, for compensatory damages, back and front pay, damages for mental anguish, punitive damages, reasonable attorneys' fees, costs of court, and pre- and post-judgment interest at the highest rate allowed by law, and for such other and further relief, general or special at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

/s/C. Ashley Callahan
C. Ashley Callahan
State Bar No. 24027545
LAW OFFICES OF C. ASHLEY CALLAHAN,
P.C.
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
Telephone:  512.817.3977
Telecopier:  512.287.3127
acallahan@callahanlawoffices.com


Nicole Conger
The Law Office of Nicole Conger, PLLC
State Bar No. 24064571
401 Congress Avenue, Suite 1540
Austin, TX 78701
(512) 413-4260
nicole@nicoleconger.com

**ATTORNEYS FOR PLAINTIFF**

C I T A T I O N

T H E   S T A T E   O F   T E X A S

**CAUSE NO. D-1-GN-21-001985**

RENE VILLARREAL

, Plaintiff

vs.

CHARLES SCHWAB & CO., INC

, Defendant

TO:    CHARLES SCHWAB & CO., INC
       BY SERVING ITS REGISTERED AGENT CT CORP SYSTEM
       1999 BRYAN ST STE 900
       DALLAS, TEXAS 75201

Defendant, in the above styled and numbered cause:

**YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org."**

Attached is a copy of the PLAINTIFF'S ORIGINAL PETITION of the PLAINITFF in the above styled and numbered cause, which was filed on APRIL 29, 2021 in the 419TH JUDICIAL DISTRICT COURT of Travis County, Austin, Texas.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office, May 03, 2021.

REQUESTED BY:
CHARLES ASHLEY CALLAHAN
THE HAEHNEL BUILDING
1101 E 11TH ST
AUSTIN, TX 78702-1908
BUSINESS PHONE:(512)817-3977  FAX:(512)287-3127



Velva L. Price
Travis County District Clerk
Travis County Courthouse
1000 Guadalupe, P.O. Box 679003 (78767)
Austin, TX 78701

PREPARED BY: RODRIGUEZ ALEXUS X

-- - -- - -- - -- - -- **R E T U R N** -- - -- - -- - -- - -- - --

Came to hand on the _____ day of _____, _____ at _____ o'clock ____M., and executed at
_____ within the County of _____ on the _____ day of
_____, _____, at _____ o'clock ____M.,

by delivering to the within named _____, each in person, a true copy of this citation

together with the PLAINTIFF'S ORIGINAL PETITION accompanying pleading, having first attached such copy of such citation to such copy of pleading

and endorsed on such copy of citation the date of delivery.

Service Fee: $ _____

Sworn to and subscribed before me this the

_____ day of _____, _____.

_____
Notary Public, THE STATE OF TEXAS

_____
Sheriff / Constable / Authorized Person

By:_____

_____
Printed Name of Server

_____ County, Texas

D-1-GN-21-001985                        SERVICE FEE NOT PAID                        P01 - 000106173

C I T A T I O N

5/6/2021 11:09 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-21-001985**
**Norma Ybarra**

T H E   S T A T E   O F   T E X A S

**CAUSE NO. D-1-GN-21-001985**

RENE VILLARREAL

vs.                                                                                          , Plaintiff

CHARLES SCHWAB & CO., INC

                                                                                            , Defendant

TO:   CHARLES SCHWAB & CO., INC
      BY SERVING ITS REGISTERED AGENT CT CORP SYSTEM
      1999 BRYAN ST STE 900
      DALLAS, TEXAS 75201

Defendant, in the above styled and numbered cause:

**YOU HAVE BEEN SUED.  You may employ an attorney.  If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org."**

Attached is a copy of the PLAINTIFF'S ORIGINAL PETITION of the PLAINITFF in the above styled and numbered cause, which was filed on APRIL 29, 2021 in the 419TH JUDICIAL DISTRICT COURT of Travis County, Austin, Texas.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office, May 03, 2021.

REQUESTED BY:
CHARLES ASHLEY CALLAHAN
THE HAEHNEL BUILDING
1101 E 11TH ST
AUSTIN, TX 78702-1908
BUSINESS PHONE:(512)817-3977  FAX:(512)287-3127

Velva L. Price
Travis County District Clerk
Travis County Courthouses
1000 Guadalupe, P.O. Box 679003 (78767)
Austin, TX 78701

PREPARED BY: RODRIGUEZ ALEXUS X

– – – – – – – – – – **R E T U R N** – – – – – – – – – – –

Came to hand on the _____ day of _____, _____ at _____ o'clock ____M., and executed at

_____ within the County of _____ on the _____ day of

_____, _____, at _____ o'clock ____M.,

by delivering to the within named _____, each in person, a true copy of this citation

together with the PLAINTIFF'S ORIGINAL PETITION accompanying pleading, having first attached such copy of such citation to such copy of pleading and endorsed on such copy of citation the date of delivery.

Service Fee: $ _____

Sworn to and subscribed before me this the

_____ day of _____, _____.

_____
Notary Public, THE STATE OF TEXAS

_____
Sheriff / Constable / Authorized Person

By:_____

_____
Printed Name of Server

_____ County, Texas

D-1-GN-21-001985                              SERVICE FEE NOT PAID                              P01 - 000106173

**AFFIDAVIT ATTACHED**

## RETURN OF SERVICE

**State of Texas**                    **County of Travis**                    **419th Judicial District Court**

Case Number: D-1-GN-21-001985

Plaintiff:
**Rene Villarreal**

vs.

Defendant:
**Charles Schwab & Co., Inc.**

Received these papers on the 3rd day of May, 2021 at 5:00 pm to be served on **Charles Schwab & Co., Inc. By Delivering To CT Coporation System, It's Registered Agent, 1999 Bryan Street, Suite 900, Dallas, TX 75201**.

I, Carlos Barrera, do hereby affirm that on the **4th day of May, 2021** at **1:30 pm, I:**

Delivered to: **Charles Schwab & Co., Inc. By Delivering To CT Coporation System, It's Registered Agent**, accepted by **Latoya Sterns, Authorized To Accept**, a true copy of the **Citation with Plaintiff's Original Petition**, with the date and hour of delivery endorsed thereon, at the address of **1999 Bryan Street, Suite 900, Dallas, Texas  75201** and informed said person of the contents therein, in compliance with state statutes.

I certify that I am over the age of 18, not a party to, nor have any interest in the outcome of the above numbered suit. I am certified under order of the Supreme Court of Texas to deliver citations and other notices.

## IN ACCORDANCE WITH RULE 107:

UNDER PENALTY OF PERJURY:   My name is **Carlos Barrera**, my date of birth is July 14, 1958 and my address is 3300 Ivy Drive, Mesquite, TX 75150, USA.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FORGOING IS TRUE AND CORRECT.

Executed in Dallas County, State of Texas, USA, on the ____5____ day of **May, 2021.**

**Carlos Barrera**
PSC5305 Exp:6/30/22

Our Job Serial Number: CBR-2021000207

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.1c

**CAUSE NO. D-1-GN-21-001985**

| | | |
|---|---|---|
| **RENE VILLARREAL,** | § | **IN THE DISTRICT COURT** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **419TH JUDICIAL DISTRICT** |
| | § | |
| **CHARLES SCHWAB & CO., INC.,** | § | |
| | § | |
| **Defendant.** | § | **TRAVIS COUNTY, TEXAS** |

**DEFENDANT'S ORIGINAL ANSWER AND DEFENSES
TO PLAINTIFF'S ORIGINAL PETITION**

Defendant CHARLES SCHWAB & CO., INC ("Defendant") files this Original Answer and Defenses to the Original Petition filed by Plaintiff RENE VILLARREAL ("Plaintiff"), as follows:

**I.    GENERAL DENIAL**

Pursuant to Texas Rule of Civil Procedure 92, Defendant generally and specifically denies each and every allegation contained in Plaintiff's Original Petition and any amendment or supplement thereto, and demands strict proof thereof. With respect to any claim by Plaintiff for punitive damages, Defendant demands strict proof thereof by clear and convincing evidence.

**II.    DEFENSES**

Without assuming any burden of proof that would otherwise rest with Plaintiff, Defendant asserts the following defenses, including affirmative defenses, as follows:

1.     Plaintiff has failed to state a claim for which relief may be granted.

2.     Plaintiff's damages, if any, are barred in whole or in part by the doctrines of estoppel, unclean hands, and/or after-acquired evidence.

---

3.      Without conceding Plaintiff has suffered any damages because of any alleged wrongdoing by Defendant, Plaintiff has failed to mitigate or minimize the alleged damages and is therefore barred, in whole or in part, from the recovery of damages.

4.      Defendant is entitled to an offset for any earnings since Plaintiff's employment ended, including payments received from insurance carriers, workers' compensation benefits, or unemployment compensation benefits.

5.      Plaintiff's claims for compensatory and punitive/exemplary damages are capped or limited by applicable law, including Chapter 41 of the Texas Civil Practice and Remedies Code and common law.

6.      All employment decisions made regarding or affecting Plaintiff were based upon legitimate, non-discriminatory, and non-retaliatory reasons.

7.      Plaintiff's claims for exemplary damages are barred because the alleged acts or omissions of Defendant, even if proven, do not rise to a level required to sustain an award of exemplary damages and do not evidence malicious, reckless or fraudulent intent to deny Plaintiff's protected rights, and are not so wanton and willful as to support an award of exemplary damages.

8.      Plaintiff's claims for exemplary damages are barred to the extent that the imposition of exemplary damages would constitute a denial of due process under the United States Constitution and the Constitution of the State of Texas.

9.      Defendant engaged in good faith efforts to comply with all applicable laws. Moreover, the conduct complained of by Plaintiff, if performed or carried out, was performed or carried out in good faith based upon reasonable grounds for believing such conduct was not in violation of state or federal law, and therefore, Plaintiff fails to state a claim for punitive or exemplary damages.

---

**DEFENDANT'S ORIGINAL ANSWER AND DEFENSES**                                    PAGE 2

10.     With respect to some or all of Plaintiff's claims, the Petition fails to state a claim upon which relief may be granted.

11.     At all times during Plaintiff's employment, Plaintiff was employed at-will and could be discharged with or without notice and with or without cause. There were no contracts or agreements that altered Plaintiff's at-will employment status.

12.     Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to exhaust administrative remedies.

13.     Plaintiff's claims are barred, in whole or in part, to the extent they exceed the scope or are inconsistent with any charge(s) of discrimination Plaintiff filed with the EEOC or TWC.

14.     As a result of Plaintiff's unreasonable delay in asserting Plaintiff's rights, Defendant has suffered a good faith change of position to Defendant's detriment. Therefore, whatever right Plaintiff might otherwise have had to bring a timely action against Defendant is barred by laches.

15.     If any improper, illegal, discriminatory, or retaliatory actions were taken by any of Defendant's employees against Plaintiff (which Defendant denies), they were outside the course and scope of that employee's employment, contrary to Defendant's policies, and were not ratified, confirmed, or approved by Defendant. Thus, any such actions cannot be attributed or imputed to Defendant.

16.     Plaintiff's claims fail because Defendant exercised reasonable care to prevent and remediate promptly any unlawful behavior and Plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by Defendant or to avoid harm otherwise.

17.     Plaintiff's claims are barred, in whole or in part, because Defendant would have taken the same action in the absence of any alleged impermissible motivating factor(s).

18.     Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations.

19.     Defendant specifically reserves the right to assert any other appropriate defenses, including affirmative defenses, to Plaintiff's claims as the need for such defenses becomes known.

### III.     PRAYER FOR RELIEF

**WHEREFORE,** Defendant respectfully requests that this Court dismiss Plaintiff's Original Petition with prejudice and that Defendant be awarded Defendant's costs, attorneys' fees, and any other relief to which Defendant may be entitled.

Respectfully submitted,

**OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.**

*/s/ Derek T. Rollins*
Derek T. Rollins
Texas Bar No. 24058079
Derek.Rollins@ogletreedeakins.com
Kathleen J. Sanz
State Bar No. 24119280
Kathleen.Sanz@ogletree.com
301 Congress Avenue, Suite 1150
Austin, Texas 78701
Telephone: (512) 344-4700
Fax: (512) 344-4701

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been forwarded by a method prescribed by the Texas Rules of Civil Procedure, on this 3rd day of June, 2021 to:

C. Ashley Callahan
LAW OFFICES OF C. ASHLEY
CALLAHAN
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
acallahan@callahanlawoffices.com

Nicole Conger
THE LAW OFFICE OF NICOLE CONGER,
PLLC
401 Congress Avenue, Suite 1540
Austin, Texas 78701
nicole@nicoleconger.com

/s/ Derek T. Rollins
Derek T. Rollins

47120111.1